**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHERIKA BARBETT**,<br>4704 Alabama Ave SE<br>Washington, DC 20019<br><br>*Individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br>v.<br><br>**COMMUNITY CONNECTIONS, INC**,<br>801 Pennsylvania Ave., SE<br>Washington, DC 20003<br><br>Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Demand Endorsed Hereon** |

## CLASS ACTION COMPLAINT

Plaintiff Cherika Barbett ("Plaintiff") brings this class action against Defendant Community Connections, Inc ("Defendant"), and alleges as follows upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personally identifiable information ("PII") and personal health information ("PHI" and together with PII, "Private Information") of Plaintiff and the Class members, including, without limitation: names, Social Security Numbers, financial information, driver's license or state identification information, medical information, and health insurance information.

2. In the course of its medical device operations, Defendant is entrusted with an extensive amount of Plaintiff's and the Class members' HIPAA protected Private Information.

3. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendant assumed non-delegable legal and equitable duties to Plaintiff and the Class members.

4. On or about October 21, 2024, an intruder gained entry to Defendant's network, accessed Plaintiff's and the Class members' Private Information, and exfiltrated the sensitive data (the "Data Breach Incident").

5. The full extent of the types of sensitive personal information, the scope of the breach, and the root cause of the Data Breach Incident is all within the exclusive control of Defendant and its agents, counsel, and forensic security vendors at this phase of the litigation.

6. Defendant did not notify Plaintiff and the Class members of the incident until on or about August 28, 2025, depriving Plaintiff and the Class members of months to protect themselves from the fallout of the Data Breach Incident.

7. Plaintiff's and the Class members' Private Information that was acquired in the Data Breach Incident can be sold on the dark web, where hackers can access and then sell the unencrypted, unredacted Private Information to other criminals. Thus, Plaintiff and the Class members face a lifetime risk of identity theft.

8. Plaintiff's and the Class members' Private Information was compromised due to Defendant's negligent acts and omissions and the failure to protect their Private Information.

9. Plaintiff and Class members continue to be at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

10. Defendant disregarded the rights of Plaintiff and the Class members by: intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to

ensure their Private Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data in the possession of its vendor. As a result, the Private Information of Plaintiff and Class members was compromised through access to and exfiltration by an unknown and unauthorized third party.

11. Plaintiff brings this action on behalf of all persons whose Private Information was compromised because of Defendant's failure to:

(i) adequately protect their Private Information;

(ii) warn of Defendant's inadequate information security practices;

(iii) effectively oversee, supervise, and secure equipment and the database containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents; and

(iv) adequately supervise and oversee its vendor with whom it shared Plaintiff's and the Class members' Private Information.

12. Plaintiff and Class members have suffered actual and imminent injuries as a direct result of the Data Breach, including (but not limited to):

(a) theft of their Private Information;

(b) costs associated with the detection and prevention of identity theft;

(c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach Incident;

(d) invasion of privacy;

(e) the emotional distress and anguish, stress, and annoyance of responding to, and resulting from, the Data Breach Incident;

(f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals;

(g) damages to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class members' Private Information against theft and not allow access and misuse of their personal data by others; and

(h) the continued risk to their Private Information that remains in the possession of Defendant and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' Private Information. Therefore, Plaintiff and Class members are, at the very least, entitled to nominal damages.

13. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## **PARTIES**

**Plaintiff Cherika Barbett**

14. Plaintiff is, and at all times relevant hereto was, a citizen and resident of Washington, DC.

15. Plaintiff provided her Private Information to Defendant as a former patient.

16. Plaintiff greatly values her privacy and Private Information. Prior to the Data Breach Incident, Plaintiff took reasonable steps to maintain the confidentiality of her Private Information.

Plaintiff would not have agreed to provide her Private Information to Defendant had Plaintiff known that Defendant would not safeguard her Private Information from unauthorized access.

17. Plaintiff is very careful about sharing her Private Information. He has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

18. Plaintiff received a letter dated August 28, 2025, from Defendant concerning the Data Breach Incident. The letter stated that unauthorized actors gained access to files on Defendant's network. The compromised files contained Plaintiff's name, Social Security number, financial information, driver's license or state identification information, medical information, and health insurance information.

19. Recognizing the present, immediate, and substantially increased risk of harm Plaintiff faces, Defendant offered her a one-year subscription to a credit monitoring service. Plaintiff has not signed up for the program as she does not trust Defendant's chosen vendor with her Private Information. Additionally, Plaintiff does not believe this is sufficient to protect her identity from the ongoing risks of theft she faces.

20. Since learning of the Data Breach Incident and in an attempt to prevent the misuse of her Private Information, Plaintiff has spent additional time reviewing her bank statements, credit cards, and reviewing her emails for fraud alerts.

21. Plaintiff plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach Incident, including continually reviewing her depository, credit, and other accounts for any unauthorized activity. Indeed, Defendant's notice directs Plaintiff to take such steps.

22. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**Defendant Community Connections, Inc.**

23. Defendant is, and at all times relevant hereto was, a non-profit Washington, D.C. corporation with its principal place of business in Washington, DC.

## JURISDICTION AND VENUE

24. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a putative class action involving thousands of Class members and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Moreover, many absent Class members and Defendant are citizens of different states.

25. This Court has general personal jurisdiction over Defendant because Defendant is headquartered in this jurisdiction.

26. Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1), 1391(b)(1), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this district.

## FACTS

27. Community Connections, Inc. is a mental health center based in Washington, D.C.

28. At the time of the Data Breach Incident, Defendant maintained Plaintiff's and the Class members Private Information utilizing a database and software.

29. By obtaining, collecting, and storing Plaintiff's and Class members' Private Information, Defendant assumed non-delegable legal and equitable duties and knew or should have

known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

30. Plaintiff and Class members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that any vendor with whom Defendant shared the information was properly supervised and had the appropriate procedures in place to protect their Private Information.

31. Defendant had a non-delegable duty to adopt reasonable measures to protect Plaintiff's and Class members' Private Information, including any Private Information Defendant shared with any of its vendors, from involuntary disclosure to third parties.

32. Prior to the Data Breach Incident, Defendant should have ensured that it had adequate monitoring software in place to detect intrusions or the transfer of large volumes of data to third party networks, that it implemented multi-factor authentication to verify the credentials of individuals attempting to access Private Information, that it limited access to Private Information to only necessary employees, that it encrypted or tokenized Private Information in internet accessible locations, and that it deleted or redacted Private Information that it was no longer required to maintain. By failing to implement these reasonable and industry standard data security measures, Defendant left Plaintiff's and Class members' Private Information in a condition vulnerable to unauthorized access.

33. On October 21, 2024, an intruder gained entry to Defendant's database, Defendant mailed Plaintiff and the Class members a form notice attempting to minimize the Data Breach Incident, while admitting that sensitive Private Information had been compromised and stolen.

34. Defendant did not notify Plaintiff of the Data Breach Incident until on or about August 28, 2025, when it finally informed them that:

> On October 21, 2024, Community Connections detected suspicious activity on its computer systems. Upon discovery of this incident, Community Connections immediately secured its systems and promptly engaged a specialized third-party cybersecurity firm to conduct a comprehensive investigation to determine the nature and scope of the incident. The forensic investigation determined that certain data was potentially accessed and acquired by an unauthorized actor.

35. Contrary to the self-serving narrative in Defendant's form notice, Plaintiff's and Class members' unencrypted information has been compromised and will end up for sale on the dark web and/or fall into the hands of companies that will use the detailed Private Information for targeted marketing without approval.

36. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and the Class members, particularly considering that Defendant is obliged to safeguard Private Information as a mental healthcare provider.

37. Plaintiff and the Class members have taken reasonable steps to maintain the confidentiality of their Private Information, relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

38. Defendant's negligence in safeguarding Plaintiff's and the Class members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

39. Defendant knew that it was a prime target for hackers given the significant amount of sensitive personal information in its possession, custody and/or control related to its patients and others. Defendant's knowledge is underscored by the massive number of data breaches that have occurred in recent years.

40. For example, 2023 featured an all-time high for data compromises, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78 percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

41. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including Change Healthcare Inc. (145 million records, February 2024), Kaiser Foundation Health Plan, Inc. (13 million records, April 2024), Ascension Health (5.6 million records, May 2024), HealthEquity, Inc. (4.3 million records, March 2024), and Acadian Ambulance Service, Inc. (2.8 million records, June 2024), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

42. Despite knowing the prevalence of data breaches, Defendant failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to their highly sensitive systems and databases. Defendant could have prevented the Data Breach Incident by encrypting and/or redacting sensitive data, limiting access to Private Information to only necessary employees, monitoring their network for signs of intrusion or the transfer of large volumes of data, and employing multi-factor authentication to ensure that only authorized individuals are granted access to sensitive data.

43. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and the U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report

explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[1]

44. Additionally, as companies became more dependent on computer systems to run their businesses,[2] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[3]

45. Despite the prevalence of public announcements and knowledge of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and the Class members from being compromised.

46. The Private Information of Plaintiff and the Class members was stolen to engage in identity theft and/or to sell it to criminals who will purchase the Private Information for that very purpose.

47. The Private Information exposed by Defendant as a result of its inadequate data security is highly valuable on the black market to phishers, hackers, identity thieves, and cybercriminals. Stolen personal information is often trafficked on the dark web, a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

---

[1] https://www.law360.com/patientprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=patientprotection
[2] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[3] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

48. Indeed, stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

49. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[4]

50. For example, Private Information can be sold at a price ranging from $40 to $200.[5] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[6]

51. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

52. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class members in the Data Breach Incident, are among the worst kind of Private Information to have

---

[4] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[5] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[6] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

53. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [7] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[8]

54. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[9]

55. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[10] "Someone who has your SSN can use it to impersonate you,

---

[7] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[8] *Id.*

[9] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[10] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[11]

56. As mentioned above, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

57. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

58. For these reasons, some courts have also referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and]

[11] *See* https://www.investopedia.com/terms/s/ssn.asp

[12] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

59. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[13]

60. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnoses lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the instant Data Breach Incident.

61. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[14] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[15] In short, these sorts of data breaches are increasingly

[13] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Nov. 6, 2023).
[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/
[15] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/

common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, as stated by the cybersecurity firm Tenable.[16]

62. According to account monitoring company LogDog, medical data sells for $50 and up on the dark web.[17]

63. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[18]

64. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[19] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft.[20]

65. This data demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[21]

---

[16] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/

[17] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed July 20, 2021)

[18] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/

[19] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/

[20] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last accessed July 24, 2023).

[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

66. Based on the foregoing, the information compromised in the Data Breach Incident is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this data breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, PHI, dates of birth, and names.

67. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even provide false information to law enforcement.

68. The fraudulent activity resulting from the Data Breach Incident may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

69. Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

70. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding Plaintiff's and the Class members' Private Information and of the

[22] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and the Class members as a result of a breach.

71. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, potentially amounting to thousands of individuals' detailed and confidential personal information and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

72. The injuries to Plaintiff and the Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and the Class members' Private Information.

73. Plaintiff has suffered and will continue to suffer a substantial risk of imminent identity, financial, and health fraud and theft; emotional anguish and distress resulting from the Data Breach Incident, including emotional stress and damages regarding the years of identity fraud Plaintiff faces; and increased time spent reviewing financial statements and credit reports to determine whether there has been fraudulent activity on any of her accounts.

74. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

### PROPOSED CLASS

75. Plaintiff brings this lawsuit as a class action on behalf of herself individually, and on behalf of all other similarly situated persons as a class action pursuant to Federal Rule of Civil Procedure

23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and 23(c)(5). The "Class" that Plaintiff seeks to represent is defined as:

> **Class: All persons in the United States whose Private Information was accessed and/or exfiltrated during the Data Breach Incident.**

76. Excluded from the Class are Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

77. Plaintiff reserves the right to modify, change, amend, or expand the definitions of the Class, as based upon discovery and further investigation.

78. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**NUMEROSITY-FEDERAL RULE OF CIVIL PROCEDURE 23(A)(1)**

79. Upon information and belief, the Data Breach Incident has impacted several thousand individuals. The members of the Class, therefore, are so numerous that joinder of all members is impracticable.

80. Identification of the Class members is a matter capable of ministerial determination from Defendant's records.

**COMMONALITY AND PREDOMINANCE—FEDERAL RULE OF CIVIL PROCEDURE 23(A)(2)**

81. There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are: [1] Whether and to what extent Defendant had a non-delegable duty to protect the Private Information of Plaintiff and Class members, including Private Information Defendant

shared with its vendor; [2] Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class members; [3] When Defendant actually learned of the Data Breach Incident; [4] Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class members that their Private Information had been compromised; [4] Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach Incident; [5] Whether Defendant adequately addressed and supervised the vulnerabilities that permitted the Data Breach Incident to occur; [6] Whether Plaintiff and the Class members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; [7] Whether Plaintiff and the Class members are entitled to restitution as a result of Defendant's wrongful conduct; and [8] Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach Incident.

82. The common questions in this case are capable of having common answers. Specifically, Plaintiff and the Class members have identical claims capable of being efficiently adjudicated and administered in this case.

**TYPICALITY-FEDERAL RULE OF CIVIL PROCEDURE 23(a)(3)**

83. Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories. Notably, Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach Incident alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

**PROTECTING THE INTERESTS OF THE CLASS MEMBERS (ADEQUACY OF REPRESENTATION-FEDERAL RULE OF CIVIL PROCEDURE 23(a)(4))**

84. Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

**SUPERIORITY-FEDERAL RULE OF CIVIL PROCEDURE 23(B)(3)**

85. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

86. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

**INJUNCTIVE RELIEF-FEDERAL RULE OF CIVIL PROCEDURE 23(b)(2)**

87. Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

88. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

89. Plaintiff bring this claim on behalf of herself and the Class.

90. Prior to the Data Breach Incident, Defendant knew or should have known that threat attackers were targeting healthcare providers in an effort to obtain personally identifiable information and misuse it to commit fraud and identity theft, particularly when stored in an internet-accessible environment, in at least the following respects:

(a) Defendant was aware of previous data breaches that had targeted healthcare providers, including breaches that affected information of their competitors;

(b) Hackers are known to routinely attempt to steal such information and use it for nefarious purposes; and

(c) Publicly available industry warnings regarding threat attackers' efforts to obtain such information for ransom or misuse were widely and readily available to Defendant.

91. Prior to the Data Breach, Defendant knowingly and intentionally acquired the Private Information of Plaintiff and the Class members.

92. In knowingly and intentionally acquiring the Private Information of Plaintiff and Class members, Defendant assumed a duty to use reasonable care, including implementing reasonable security practices and procedures, to safeguard the Private Information of Plaintiff and Class members against unauthorized access, acquisition, and misuse.

93. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts

§ 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

94. Defendant owed a duty of care to Plaintiff and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

95. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information-a necessary part of doing business with Defendant.

96. Here, each factor is satisfied as (1) the transactions in which Plaintiff and the Class provided their Private Information to Defendant were for the purpose of allowing Plaintiff and Class members access to healthcare services; (2) data breaches targeting Private Information are readily foreseeable and the subject of frequent warnings by data security experts and state and federal governments; (3) the injuries associated with the theft and misuse of Plaintiff's and Class members' Private Information, including the expenditure of time and money mitigating the consequences of a data breach and the destruction of confidentiality of Private Information are alleged herein; (4) the theft of Private Information and Plaintiff's allegations that Defendant failed to implement reasonable data security measures is logically connected to and proximately caused by the Data Breach Incident; (5) the moral blame associated with Defendant's collection and use of Plaintiff's and the Class's PII for its own profit while failing to fund data security measures intended to protect Private Information from the foreseeable consequences of a data breach is high; and (6) imposing liability of Defendant for failing to safeguard Private Information ensuring that personal information is protected and preventing the theft and misuse of Private Information by criminals.

97. Defendant also had an independent duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

98. Defendant also had a duty to safeguard Private Information under HIPAA which requires that entities that maintain medical information implement reasonable data security safeguards.

99. Both Section 5 of the FTC Act and HIPAA are intended to protect Plaintiff and Class members against the injuries associated with the compromise of Private Information.

100. Defendant failed to use reasonable care by storing the Private Information of Plaintiff and Class members in an internet-accessible environment under the following circumstances:

(a) The Private Information of Plaintiff and Class members was not encrypted.

(b) The Private Information of Plaintiff and Class members that Defendant had no reasonable need to store in an internet-accessible environment, including the Private Information of Plaintiff and Class members with whom Defendant had not had a relationship for years, was not removed from Defendant's network.

(c) The movement of the Private Information of Plaintiff and Class members from Defendant's network to the internet was not monitored and detected in real time.

101. Defendant was negligent in that it failed to ensure that it had adequate monitoring software in place to detect intrusions or the transfer of large volumes of data to third party networks, that it implemented multi-factor authentication to verify the credentials of individuals attempting to access Private Information, that it limited access to Private Information to only necessary employees, that it encrypted or tokenized Private Information in internet accessible locations, and that it deleted or redacted Private Information that it was no longer required to maintain. By failing to implement these

reasonable and industry standard data security measures, Defendant left Plaintiff's and Class members' Private Information in a condition vulnerable to unauthorized access.

102. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will continue to suffer injury, including but not limited to:

(i) actual identity theft, including unauthorized charges;

(ii) the loss of the opportunity to control how their Private Information is used;

(iii) the compromise, publication, and/or theft of their Private Information, including the exposure of their Private Information on the dark web and the substantial risk of future harm;

(iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiff's and Class members' respective lifetimes;

(v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach Incident, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and other identity theft;

(vi) costs associated with placing freezes on credit reports;

(vii) the present and continuing risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the current and former customers' Private Information in their continued possession;

(viii) damages consisting of the cost of identity theft protection services for the remainder of the lives of Plaintiff and Class members; and

(ix) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromise of the Private Information resulting from the Data Breach Incident for the remainder of the lives of Plaintiff and Class members.

103. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will suffer the continued risk of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

104. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members are now at an increased risk of identity theft or fraud.

105. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members are entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

106. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

107. Pursuant to the Federal Trade Commission Act (15 U.S.C. §45), Defendant had a duty to provide fair and adequate data security practices to safeguard Plaintiff's and Class members PII.

108. Pursuant to HIPAA (42 U.S.C. §1302d et. seq.), Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class members' PII and timely notify Plaintiff and Class members of the Data Breach Incident.

109. Defendant breached its duties to Plaintiff and Class members under the Federal Trade Commission Act (15 U.S.C. § 45) and HIPAA (42 U.S.C. § 1302d et. seq.) by failing to provide (a) fair, reasonable, or adequate data security practices to safeguard Plaintiff's and Class members' PII, and (b) timely notice of the Breach Incident.

110. Defendant's failures to comply with applicable laws and regulations constitute negligence per se.

111. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

112. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's Data Breach Incident would cause Plaintiff and Class members to experience the foreseeable harms associated with the exposure of their Private Information.

113. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

114. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

115. Through its course of conduct, Defendant, Plaintiff, and Class members entered into implied contracts for the provision of mental healthcare services, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff' and Class members' Private Information.

116. Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendant when she first entered into the mental healthcare services contract with Defendant.

117. The valid and enforceable implied contracts to provide healthcare services that Plaintiff and Class members entered into with Defendant include Defendant's promise to protect nonpublic Private Information given to or created by Defendant from disclosure.

118. When Plaintiff and Class members provided their Private Information to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

119. Defendant solicited and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class members accepted Defendant's offers and provided their Private Information to Defendant.

120. In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

121. Under implied contracts, Defendant promised and was obligated to protect Plaintiff and Class members' Private Information provided to obtain the benefits of the mental healthcare services.

122. Both the provision of mental healthcare services and the protection of Plaintiff and Class members' Private Information were material aspects of these implied contracts.

123. The implied contracts for the provision of mental healthcare service contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class members' Private Information are also acknowledged, memorialized, and embodied in multiple documents,

including (among other documents) Defendant's Data Breach Incident notification letter and Defendant's relevant privacy policy documents.

124. Defendant's express representations, including, but not limited to the express representations found in its privacy policy, memorializes and embodies the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff' and Class members' Private Information.

125. Consumers of healthcare services value their privacy, the privacy of their dependents, and the ability to keep confidential their Private Information associated with obtaining such services. Plaintiff and Class members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected, nor would they have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

126. A meeting of the minds occurred, as Plaintiff and Class members agreed and provided their Private Information to Defendant and paid for the provided mental healthcare services in exchange for, among other things, both the provision of healthcare and the protection of their Private Information.

127. Plaintiff and Class members performed their obligations under the contract when they paid for Defendant's services and provided their Private Information.

128. Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when the information was accessed and exfiltrated by the Data Breach Incident.

129. Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant privacy policy. Defendant did not maintain the privacy of Plaintiff's and Class members' Private Information as evidenced by its notifications of the Data Breach Incident to Plaintiff and Class members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiff's and Class members' private information as set forth above.

130. The Data Breach Incident was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

131. As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class members did not receive full benefit of the bargain, and instead received mental healthcare services that were of a diminished value to that described in the contracts. Plaintiff and Class members, therefore, were damaged in an amount at least equal to the difference in the value between the mental healthcare with data security protection they paid for and the mental healthcare they received.

132. Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither Plaintiff, Class members, nor any reasonable person would have paid for mental healthcare services from Defendant, from which services Defendant directly benefits.

133. As a direct and proximate result of the Data Breach Incident, Plaintiff and Class members will suffer actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and

treatment, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

134. Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach Incident.

135. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

136. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

137. In providing their Private Information to Defendant, Plaintiff and Class members justifiably placed a special confidence in Defendant to act in good faith and with due regard for the interests of Plaintiff and Class members to safeguard and keep confidential that Private Information.

138. Defendant accepted the special confidence Plaintiff and Class members placed in it, as evidenced by its assertion that it is committed to protecting the privacy of Plaintiff's personal information as included in the Data Breach Incident notification letter.

139. In light of the special relationship between Defendant, Plaintiff, and Class members, whereby Defendant became a guardian of Plaintiff and Class members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class members for the safeguarding of Plaintiff and Class members' Private Information.

140. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of its relationships, in particular, to keep secure the Private Information of its patients.

141. Defendant breached its fiduciary duties to Plaintiff and Class members by failing to protect the integrity of the systems containing Plaintiff's and Class members' Private Information.

142. Defendant breached its fiduciary duties to Plaintiff and Class members by otherwise failing to safeguard Plaintiff and Class members' Private Information.

143. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including but not limited to:

a. Actual identity theft;

b. The compromise, publication, and/or theft of their Private Information;

c. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

d. Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach Incident, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

e. The continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as

Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

f. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach Incident for the remainder of the lives of Plaintiff and Class Members; and

g. The diminished value of the services they have received.

144. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT V**
**UNJUST ENRICHMENT/ QUASI CONTRACT**
**(On Behalf of Plaintiff and the Class)**

145. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

146. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Plaintiff and Class members should have received from Defendant data storage that was compliant with and maintained in accordance with Defendant's pre-existing duties to secure such information under federal law and industry standards and were entitled to have Defendant protect their Private Information with adequate security.

147. Defendant knew that Plaintiff and Class members conferred a benefit on them and accepted or retained that benefit. Defendant profited from Plaintiff's and Class Members' Private Information for business purposes.

148. Defendant failed to secure Plaintiff's and Class Members' Private Information and therefore, did not provide full compensation for the benefit the Plaintiff's and Class members' Private Information provided.

149. Defendant acquired the Private Information through inequitable means as they failed to disclose the inadequate security practices previously alleged.

150. If Plaintiff and Class Members had known that Defendant would not secure their Private Information using adequate security, they would not have provided their information to Defendant.

151. Plaintiff and Class Members have no adequate remedy at law.

152. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class members conferred on them.

153. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and the Class members overpaid for the use of Defendant's services.

**COUNT VI**
**DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Class)**

154. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

155. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

156. An actual controversy has arisen in the wake of the Data Breach Incident regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

157. The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect patients' Private Information.

158. Defendant still possesses the Private Information of Plaintiff and the Class.

159. To Plaintiff's knowledge, Defendant has made no announcement that it has changed its data storage or security practices relating to the Private Information.

160. To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach Incident.

161. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Community Connections, Inc. The risk of another such breach is real, immediate, and substantial.

162. The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Community Connections, Inc., Plaintiff and Class members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the

cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

163. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Community Connections, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other patients whose Private Information would be further compromised.

164. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Community Connections, Inc. implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Community Connections, Inc.'s systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

e. Conducting regular database scans and security checks; and

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

165. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

a) An order certifying this case as a class action on behalf of the Class as defined above, and appointing Plaintiff as the representative of the Class and Plaintiff's counsel as Class Counsel;

b) Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and the Class members;

c) Injunctive relief, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members, including (but not limited to) an order:

(1) requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

(2) requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class members unless Defendant can provide to the

Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class members;

(3) requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class members;

(4) prohibiting Defendant from maintaining Plaintiff's and Class members' Private Information on a cloud-based database;

(5) requiring Defendant to engage independent third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third party security auditors;

(6) requiring Defendant to engage independent third party security auditors and internal personnel to run automated security monitoring;

(7) requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

(8) requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

(9) requiring Defendant to conduct regular database scanning and securing checks;

(10) requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees'

respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class members;

(11) requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response thereto;

(12) requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting Private Information;

(13) requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

(14) requiring Defendant to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

(15) requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

(16) for a period of 10 years, appointing a qualified and independent third party assessor to conduct attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to

the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

d) For an award of damages, including actual, statutory, consequential, and nominal damages, as allowed by law in an amount to be determined;

e) For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f) For prejudgment interest on all amounts awarded; and

g) Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury.

DATED: September 4, 2025

Respectfully submitted,

*/s/ Jason S. Rathod*
Jason S. Rathod (Bar No. 100082)
Migliaccio & Rathod LLP
412 H Street NE
Washington, D.C. 20002
Office: (202) 470-3520
Fax: (202) 800-2730
jrathod@classlawdc.com
www.classlawdc.com

DAPEER LAW, P.A.
Rachel Dapeer, Esq. (*pro hac* forthcoming)
Florida Bar No. 108039
520 South Dixie Hwy, # 240
Hallandale Beach, FL 33009
Telephone: 954-799-5914
Email: rachel@dapeer.com

HIRALDO P.A.
Manuel S. Hiraldo, Esq. (*pro hac* forthcoming)
Florida Bar No. 030380
401 E. Las Olas Boulevard
Suite 1400

Ft. Lauderdale, Florida 33301
Email: mhiraldo@hiraldolaw.com
Telephone: 954.400.4713